IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **ECAP HOLDINGS, LLC,** § | |
| § | |
| Plaintiff, § | |
| v. § | |
| § | Civil Action No. **3:18-CV-2193-L** |
| **QUIXOTIC FARMING, LLC; T. LANE** § | |
| **CONSTANT; RANDY CONSTANT;** § | |
| **WILLIAM O'CONNOR; KENT DRYER;** § | |
| **QUIXOTIC INVESTMENTS, LLC;** § | |
| **PESCADO, LLC; TRUE SON LEASING;** § | |
| **THE ZOU LEASING; and INNOVATIVE** § | |
| **AQUACULTURE ALLIANCE, LLC,** § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

Before the court is the Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5) (Doc. 18), filed February 22, 2019. After considering the motion, briefs, evidence submitted by the parties, record, and applicable law, the court **denies without prejudice** Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5) (Doc. 18) and **grants** Plaintiff's request to conduct jurisdictional discovery.

**I.    Factual and Procedural Background**

On June 14, 2018, Plaintiff ECAP Holdings, LLC ("Plaintiff" or "ECAP") brought this action in state court against Defendants Quixotic Farming, LLC ("Quixotic Farming"); T. Lane Constant ("L. Constant"); Randy Constant ("R. Constant"); William O'Connor ("O'Connor"); Kent Dryer ("Dryer"); Quixotic Investments, LLC ("QI"); Pescado, LLC ("Pescado"); True Son Leasing ("TSL"); The Zou Leasing ("Zou"); and Innovative Aquaculture Alliance, LLC ("IAA")

**Memorandum Opinion and** Order **– Page 1**

(collectively, "Defendants"). The action was removed to federal court on August 20, 2018, based on diversity jurisdiction. In its Amended Complaint ("Complaint"), filed February 1, 2019, ECAP requests relief in the form of a declaratory judgment and asserts claims for breach of contract, quantum meruit, tortious interference with existing and prospective contract relations, common law fraud, fraud in a securities transaction, negligent misrepresentation, and fraudulent transfer.

In support of these claims, ECAP alleges that:

> 14. ECAP is a merchant bank that specializes in accelerating high quality, development stage companies through their initial growth phase. ECAP assists early development stage companies with their business planning, financial modeling, and presentations for investors. After being hired by such companies, ECAP presents opportunities for accredited investors in a portfolio of companies that have the potential to be industry leaders of tomorrow. ECAP typically makes investments into its featured companies, which are 2-5 years in duration and limits their representation to 2-4 companies at a time, aligning their interests with both peer investors and the company's management.
>
> 15. Such was the situation when ECAP was introduced to Quixotic Farming and its Management Team (R. Constant, L. Constant, Dryer and O'Connor) in early 2016. R. Constant and L. Constant were identified as two of the principals of Quixotic Farming, CEO and COO respectively. R. Constant is the father of L. Constant. O'Connor was represented to be the CFO of Quixotic and to be "heavily involved in the strategic growth of the company" and to provide "hands-on analytical and finance advisory services." R. Constant, L. Constant, Dryer and O'Connor are collectively referred to herein as "Management Team". Quixotic Farming and its Management Team wanted to use the services of ECAP to raise funds through investment from accredited investors to be located by ECAP for that purpose, with a goal of raising at least $7,000,000 in new capital to be injected into Quixotic Farming.
>
> 16. Quixotic Farming was located in Chillicothe, Missouri and was represented to ECAP in Texas by the Management Team in one or more telephone calls to be a company engaged in aquaculture—commercial for-profit fish farming, and also claiming to be the largest producer/seller of pure fresh water tilapia in the United States. It was further represented to ECAP by Quixotic Farming and its Management Team that since its founding in 2011, the Management Team had invested over $9,000,000 of their own capital into Quixotic Farming on research and development, facilities and operations in the pursuit of perfecting their process of growing and selling hormone-free, clean-diet tilapia.

> 17. During a conference call on May 4, 2016, which included each member of the Management Team (R. Constant, L. Constant, Dryer, and O'Connor), the Management Team specified the purported assets of Quixotic Farming and represented to ECAP's members who were located in Texas at the time, that all of the assets used in the business of Quixotic Farming were owned by Quixotic Farming, free and clear of any liens, debts and/or liabilities. This included the former Wal-Mart store in Chillicothe, Missouri where Quixotic Farming conducted its operations; as well as all fish tanks, equipment, supplies and machinery located in that building. It also was represented to ECAP's members who were located in Texas during that call that Quixotic Farming owned all facilities and equipment located in Colorado where Quixotic Farming had additional fish farming operations. The bottom line is Quixotic Farming was represented to ECAP's representatives located in Texas during one or more telephone calls with Quixotic Farming and its Management Team (R. Constant, L. Constant, Dryer and O'Connor) that Quixotic Farming was a company that had at least $9,000,000 of assets in its name, which were free and clear of all liens, debts and/or liabilities. These representations later turned out to be false, but it was based on those false representations made to ECAP's members located in Texas by Quixotic Farming and its Management Team, that ECAP detrimentally relied as it was induced into entering into a contract to perform services for Quixotic Farming.

Pl.'s Compl. ¶¶ 14-17. ECAP alleges that, based on the foregoing representations and financial information provided to it in Texas, ECAP, on April 28, 2016, agreed to enter into a Non-Disclosure and Non-Circumvent Agreement ("NDA") with Quixotic Farming pursuant to which the parties agreed not to "engage in any negotiations or to execute any agreement, understanding or undertaking whatsoever with any person or entity that has a business relationship with the other party[.]," and, on June 22, 2016, ECAP and Quixotic Farming entered into an Advisory Services Agreement ("ASA") in which ECAP was hired by Quixotic Farming to secure investments for Quixotic Farming for both cash and equity in Quixotic Farming. That executed ASA was delivered to ECAP by Quixotic Farming and its Management Team in Texas. *Id.* ¶¶ 18-19. ECAP also made a cash investment of $25,000 in Quixotic Farming and, under the ASA, it was to receive an initial 3.5% ownership interest in Quixotic Farming.

**Memorandum Opinion and** Order – Page 3

ECAP alleges that it subsequently had found an investor who was considering making a substantial investment in Quixotic Farming in December 2016, but it discovered while gathering due diligence information requested by the investor that the assets previously represented to be owned by Quixotic Farming were not actually owned by Quixotic Farming but, instead, by members of the Management Team and various other related entities (Pescado, Zou, QI, TSL) that were owned by members of the Management Team. ECAP alleges that, when it confronted R. Constant and other Management Team members and advised that it would cease all work and correct unknowing misrepresentations made to potential investors if they did not immediately correct the ownership structure of all assets used by Quixotic Farming from that point forward to be owned 100% by Quixotic Farming, free and clear:

> R. Constant and/or the members of the Management Team, QI, Pescado, Zou and TSL immediately promised and represented to ECAP that all assets used by Quixotic Farming but not then "owned" by Quixotic Farming or "titled" in the name of Quixotic Farming would be conveyed into and become part of Quixotic Farming and that Quixotic Farming would then own all such assets – free and clear of all liens, debts and/or liabilities. These representations were made either in person and/or via telephone to ECAP's representatives who were located in Texas at the time of such representations.

*Id.* ¶ 26.

ECAP alleges that, based this representation and assurance, it proceeded to negotiate with other potential investors. During this same time, ECAP alleges that it "was assured in Texas by Quixotic Farming and its Management Team (R. Constant, L. Constant, Dryer and/or O'Connor), Zou, Pescado, TSL and QI that the transfer / assignments of all assets to Quixotic Farming would occur prior to the closing of any investment by any outside accredited investor." *Id*. ¶ 27. ECAP alleges that it, in the first quarter of 2017, it found and introduced a potential investor to Quixotic

Farming, who indicated its intent to soon make a sizeable investment in Quixotic Farming, which would have entitled ECAP to:

> additional compensation from Quixotic Farming under the ASA of $350,000 cash, plus an additional 10% equity (valued at $900,000— 10% of a $9,000,000 company) prior to receipt of additional investment capital/financing. After an investment/financing from Allen of $7,612,500, the combined enterprise value for Quixotic Farming would likely have been in excess of $20M, which would have provided cash/equity/value to ECAP worth approximately $2,350,000.00 under the terms of the ASA.

*Id*. ¶ 28.

According to ECAP, Defendants terminated the ASA without warning on March 7, 2017, to "cheat" ECAP out of the fee and equity it had earned for its efforts if Defendants had moved forward with and closed the transaction with the investor while ECAP was Quixotic Farming's advisor. After the allegedly wrongful termination of the ASA, ECAP sued Quixotic Farming on May 10, 2017, seeking declaratory relief, Quixotic Farming, L. Constant, R. Constant and possibly others who formed IAA, Quixotic Farming ceased all operations, and all or substantially all of Quixotic Farming's assets and the assets of the other Defendants were transferred to IAA without fair consideration for the improper purpose of avoiding liability in the state lawsuit brought by ECAP.

After learning this, ECAP dismissed without prejudice that action and sued Quixotic Farming and the other Defendants in this action on June 14, 2018. ECAP alleges in its Complaint that R. Constant, L. Constant, and O'Connor should be held liable under an alter ego theory of liability for the claims asserted against Quixotic Farming in this action because they controlled the finances, policy and business practices of Quixotic Farming with respect to the unlawful acts alleged. On February 22, 2019, Defendants moved to dismiss the action for lack of personal jurisdiction and insufficient service of process under Federal Rules of Civil Procedure 12(b)(2) and (b)(5).

In response, ECAP asserts that its Complaint and the affidavits submitted by it support a finding of specific personal jurisdiction because Defendants engaged in tortious conduct that was directed at ECAP in Texas. ECAP contends that Defendants' motion for insufficient service of process should be denied for similar reasons. Alternatively, ECAP requests that it be allowed to conduct jurisdictional discovery prior to a ruling on Defendants' motion if the court determines that the motion, based on the current record, has merit. In this regard, ECAP requests that it be allowed to conduct jurisdictional discovery regarding disputed facts raised by Defendants' Rule 12(b)(2) motion, including "a request for production of documents, and depositions of the individual defendants in both their individual and corporate capacities on issues limited to specific jurisdictional contacts out of which this litigation arose." Pl.'s Resp. 15.

## II.     Request to Conduct Jurisdictional Discovery

A court may grant jurisdictional discovery when the plaintiff seeking it makes a "preliminary showing of jurisdiction" over a nonresident defendant. *See Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 429 (5th Cir. 2005) (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir.2003), for the proposition that, "[i]f a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts . . . the plaintiff's right to conduct jurisdictional discovery should be sustained."). Discovery regarding personal jurisdiction is appropriate when the motion to dismiss raises issues of fact. *Kelly v. Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 855 (5th Cir.2000) (citation omitted). District courts have considerable discretion in determining whether to grant or deny a party's request to conduct jurisdictional discovery. *Fielding*, 415 F.3d at 429.

Defendants contend that ECAP has not carried its burden of showing that it is entitled to jurisdictional discovery because it has not identified the facts expected to be obtained or explained how those facts will establish personal jurisdiction. The court disagrees. The parties' briefs, evidence, and Plaintiff's pleadings raise issues of fact, for example, regarding the individual Defendants' relationship to the entity Defendants, the extent, if any, the various individual Defendants controlled or took action on behalf of the entity Defendants, and in what capacity they engaged in the conduct alleged. *See, e.g.*, Pl.'s' Resp. ¶ 21. Information regarding these facts will assist the court in determining whether it can exercise specific personal jurisdiction over each Defendant. Accordingly, the court will allow Plaintiff to conduct jurisdictional discovery as requested, after which Defendants may reurge their motion to dismiss.

## III. Conclusion

For the reasons stated, the court **denies without prejudice** Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5) (Doc. 18) and **grants** Plaintiff's request to conduct jurisdictional discovery. The discovery will be expedited, shall be limited to Plaintiff's contention that the court has specific personal jurisdiction over Defendants, and **must be completed by December 31, 2019, not initiated on this date. The parties shall cooperate so that jurisdictional discovery is conducted and completed in an expeditious fashion.** Any further motion to dismiss by Defendants based on lack of personal jurisdiction and insufficient service must be filed by **January 30, 2020.**

**It is so ordered** this 30th day of September, 2019.

_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge